UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | | |
|---|---|---|
| TRAMAINE MOORE, DESIREE JONES, | * | |
| | * | |
| BRANDIE ROBERTSON, | * | CIVIL ACTION No. |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | JURY TRIAL DEMADED |
| | * | |
| TERI GALARDI. | * | |
| | * | |
| Defendant. | * | |

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

COMES NOW, the above-named Plaintiffs and hereby state their claims against the above-named Defendant and shows the court the following:

**INTRODUCTION**

Plaintiffs were all employed as exotic dancers at the King of Diamonds, a world-famous gentlemen's club located in Miami Florida.  Exotic dancers at the King of Diamonds, including the Plaintiff's were required to pay a "house fee" for the privilege of working at King of Diamonds ("KOD").  These house fee ranged from $50.00-$500.00.   In addition, the Plaintiffs were required to tip out the Disc Jockey (DJ), housemom, security and pay the club ten percent (10%) of their daily earning back to the club. The house fees and tipouts constituted unlawful kickbacks pursuant to well established case law.  The Plaintiffs were also required to work two "slow days" per week, attend mandatory monthly meetings and were not permitted to leave unless they were given a signed slip from a member of management.

The Defendant willfully misclassified the Plaintiffs as "independent contractors" instead of

employees, and deprived them of the minimum wages that they are entitled to pursuant to the Florida Minimum Wage Act ("FMWA") and Article X Section 24 of the Florida Constitution. Pursuant to the FMWA, the Plaintiffs provided the Defendant with the statutorily required pre-suit notices and outlined the approximate amount in damages owed as a result of Defendant's failure to pay minimum wages and the amount owed in the unlawful kickbacks paid to the club. Defendant failed to respond to the pre-suit notices and as a result the instant complaint results.

## SUBJECT MATTER JURISDICTION

### 1.

The Court has jurisdiction to adjudicate the Plaintiffs' claims based on complete diversity of the parties and the amount in controversy exceeds seventy-five thousand dollars ($75,000). The combined total amount of unliquidated damages is in excess of five hundred thousand dollars ($500,000).

## VENUE

### 2.

Venue is proper in the Southern District of Florida, under 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this judicial district.

## PARTIES TO THE COMPLAINT

### 3.

Plaintiff TRAMAINE MOORE is a resident of the State of Florida and was previously employed by Defendant Galardi during the applicable limitations period (2009 to 2014) as a dancers-

entertainers at the Gentleman's Club known as "King of Diamonds" located at 17800 NE Fifth Avenue, Miami, FL., 33160, by Defendant Galardi.

4.

Plaintiff DESIREE JONES is a resident of the State of Florida and was previously employed by Defendant Galardi during the applicable limitations period (2009 to 2014) as a dancers-entertainers at the Gentleman's Club known as "King of Diamonds" located at 17800 NE Fifth Avenue, Miami, FL., 33160, by Defendant Galardi.

5.

Plaintiff BRANDIE ROBERTSON is a resident of the State of Indiana and was previously employed by Defendant Galardi during the applicable limitations period (2009 to 2014) as a dancers-entertainers at the Gentleman's Club known as "King of Diamonds" located at 17800 NE Fifth Avenue, Miami, FL., 33160, by Defendant Galardi.

6.

Defendant TERI GALARDI is domiciled in and a resident of the State of Georgia. Defendant Galardi was the CEO and controlling shareholder Fly Low, Inc, dba King of Diamonds.

7.

All of the named Plaintiffs in this action were previously unnamed class members in a certified Rule 23 class action suit, Espinoza et al v. Galardi South Enterprises, Inc., et al, Civil Action File No. 14-cv-21244-Goodman, filed in the United States District Court for the Southern District of Florida on April 8, 2014, which also alleged violations of Article X, Section 24 of the Florida Constitution and Fl. Stat. 448.110 against the same Defendant Galardi named herein.

8.

Those claims were certified as a Rule 23 Class Action on January 11, 2016, in Espinoza, but were dismissed without prejudice on April 10, 2018, when the Court determined that it would not exercise supplemental federal jurisdiction over such claims.

9.

The limitations period applicable to the state law claims of the Espinoza class members was therefore tolled on April 8, 2014, and remained tolled until May 10, 2018. 28 U.S.C. Sec. 1367(d); *Griffin v. Singletary*, 17 F.3d 1356 (11th Cir. 1994); *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S. Ct. 756, 38 L.Ed.2d 713 (1974); *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 103 S. Ct. 2392, 76 L.Ed.2d 628 (1983); *Latman v. Costa Cruise Lines*, 758 So.2d 699 (District Court of Appeal of Florida, Division 3, 2000); *Kornberg v. Carnival Cruise*, 7412d 1332 (11th Cir. 1984); *Sacred Health Health Service v Humana Military Healthcare*, 2008 WL 2385506 (N.D. Fl. 2008); *Raie v. Cheminova, Inc.,* 336 F.3d 1278, 1282 (11th Cir.2003); *Barkley v. Pizza Hut*, 2015 WL 5008468 (M.D. Fla. 2015).

10.

Defendant Mrs. Teri Galardi (hereinafter "Galardi" or "Defendant") is a natural person who, although previously resided in the State of Florida between 2008 and 2017, is currently a resident of Butts County located in the State of Georgia.  Defendant Galardi has a long history of actively attempting to avoid service in matters involving her management and operation of strip clubs under her control and direction.

11.

Galardi has frequently and routinely operated, conducted, and engaged in, and carried out a

business or business ventures in the State of Florida, including owning and/or operating numerous businesses licensed to do business within the State of Florida.

12.

During calendar years 2008 to 2018, Defendant Galardi actively served as the President, Secretary, and Treasurer of Fly Low, Inc, dba King of Diamonds.

13.

During the time period 2008 until 2014, Defendant Galardi actively managed and directed the terms and conditions of Fly Low/KOD employees, as more specifically alleged herein. The acceptance by Defendant Galardi of the privilege of operating, conducting, engaging in and carrying on a business or business venture in the State of Florida constituted her appointment of the Secretary of State of Florida to act as her agent, upon whom process in any action arising from her management and direction of Defendant Fly Low may be served. Defendant Galardi is subject to the personal jurisdiction of this Court.

14.

During the pertinent time frame, Defendant Galardi engaged in concerted and related activities for the common business purpose of making money, and have previously admitted, in judicio, that

a.   Defendant had employees engaged in the handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person (including but not limited to alcoholic beverages and other commodities manufactured/created in States outside of Florida); and

b.  had an annual gross volume of sales or business done of not less than $500,000.00.

## FACTUAL ALLEGATIONS

15.

As of November, 2008, Defendant Galardi and her Father, Jack Galardi, and/or the Jack E. Galardi Trust, owned and operated not fewer than six "Gentlemen's Clubs" located in Florida, Georgia, South Carolina, and Las Vegas, Nevada.

16.

Each Galardi-controlled Club was owned by a separate shell corporation, for example,

a.  Fly Low, Inc. (Fl) operated the King of Diamonds in Miami, Fl;

b. Bella Mia, Inc. (Fl) operated the Pink Pony in Doral, Fl;

c. Funnytime, Inc., operated the Pink Pony Pompano;

d. Trop. Inc. (Ga) operated the Pink Pony in Atlanta, Ga.;

e. Pony Tail, Inc. (Ga) operated Club Onyx in Atlanta, Ga.;

f. Country Club, Inc. (Ga) operated the Goldrush in Atlanta, Ga.;

g. Country Club, Inc., (SC) operated the Masters, in Myrtle Beach, SC; and

h. La Fuente, Inc. (Nev) and operated Cheetahs in Las Vegas, Nev.,

all of which were in turn owned by Teri Galardi.

17.

At all times pertinent to this litigation, Galardi South Enterprises Consulting, Inc. (and/or its predecessor, Galardi South Enterprises, Inc.) were Georgia Corporations, through which Defendant Galardi and her agent/servant Dennis Williams operated as the centralized, Galardi-owned management company, which directed all of the subsidiary shell corporations which directly owned the respective clubs.

18.

At all times relevant to this complaint, all of the Galardi-controlled "Gentlemen's Clubs" operated under a common business model initially implemented by Jack Galardi, and known of, approved and enforced by Jack Galardi and his daughter, Defendant Teri Galardi.

19.

The common business model applicable at all Galardi-controlled strip clubs was as follows:

a. Due to unequal bargaining power, dancers were forced to sign "independent contractor" agreements at the outset of their employment, and were thereafter classified as "independent contractors" rather than "employees";

b. Dancers received no wages whatsoever from the Clubs for whom they worked; instead, all of their compensation was received directly from Club customers;

c. As to Dancers, the Galardi-controlled clubs paid no Federal or State employer payroll taxes, social security contributions, worker's compensations insurance premiums, or unemployment compensation insurance;

d. Dancers were forced to pay fees to and on behalf of the Club for the privilege of working

at the Club;

e. Dancers were subject to immediate, direct, and pervasive control by the Clubs for whom they worked (including Fly Low - King of Diamonds), and by Jack and Teri Galardi, in the form of oral and written work rules, enforced via pervasive supervision and direction, disciplinary fines, suspensions, and other sanctions;

20.

Fly Low began doing business as the "King of Diamonds" ("KOD") in November of 2008.

21.

Defendant Galardi purchased a home located at 15820 SW 53 Court, Southwest Ranches, Florida, 30216, on or about September 15, 2008 worth in excess of one million dollars ($1,000.000) for cash.

22.

Defendant Galardi was the President, Secretary and Treasurer of Defendant Fly Low, Inc., since at least 2008, and continued to hold those positions as of 2018.

23.

At all times during the applicable limitations period, Defendant Galardi, willfully mischaracterized all dancers/entertainers employed at KOD as "independent contractors" with full knowledge that doing so constituted violations of both Article X, Section 24 of the Florida Constitution ("Section 24") and the Florida Minimum Wage Act, Fl. St. 441.110 ("FMWA"), as well as the Fair Labor Standards Act, 29 U.S.C. §206 et seq, resulting in her failure and refusal to pay any wages or compensation to the Plaintiffs.

24.

At all times pertinent to this action, Defendant Galardi knew of and approved of the mischaracterization of KOD dancers as independent contractors, despite her actual knowledge that this practice constituted a violation of Article X and the FMWA, as well as the Fair Labor Standards Act.

25.

In addition, to failing to pay the Plaintiffs the statutorily required minimum wage, Defendant Galardi charged the Plaintiffs to work each day at the King of Diamonds.

26.

The job duties of KOD dancers consisted primarily of dancing on stage during the stage rotation, and performing personal dances (also called "lap dances" or "private dances") for customers, and spending time in semi-private rooms.

27.

At all times during the applicable limitations period, Defendant Galardi exercised a great degree of operational and management control over the King of Diamonds operation, including:

a. its location, its days of operations;

b. its hours of operation;

c. its theme and motif;

d. selection and acquisition of its furnishings;

e. the creation and implementation of club policies, practices, and procedures,

f. the hiring and firing of club personnel;

g. and the terms and conditions of employment applicable to club employees

(Plaintiffs);

h. choosing the legal forum to adjudicate legal disputes (many dancers were forced to sign arbitration agreements that included class action waivers).

28.

At all times pertinent to this action, Defendant required entertainers to audition in order to be hired; however, an entertainer's physical appearance and not any level of dance, performance, or sales skill determined their suitability to perform at KOD. No prior experience or training was required to be hired as a dancer-entertainer.

29.

Defendant Galardi herself, or through authorized agents imposed upon the Plaintiffs a corporate-wide, uniform rules, written guidelines and policies, as well as verbal directives, which governed all aspects of the work to be performed by KOD dancers/entertainers.

30.

Defendant Galardi and her agents required KOD dancers to dance on stage according to a stage rotation established by Defendant or her agents, including the disk jockey ("DJ").

31.

Defendant, through her authorized agents, placed dancers/entertainers into the stage rotation and were required to dance at the time their name was called. Each stage dance was required to last

for a specified number of songs. Entertainers were told how much clothing to remove during each song, i.e., top only during the first song, and then all clothing, save a G-String, during the second song, and fully nude during the third song.

32.

Defendant, through her authorized agents, controlled the music played in the club, and dancers/entertainers were not allowed by the Defendant to choose the songs that were played while they danced.

33.

Defendant, through her authorized agents set the price of personal dances performed for KOD customers. The price for a personal dance was the same regardless of which entertainer performed the dance. KOD dancers were not allowed to charge a different price than the price established by Defendant, through her agents. Plaintiffs were not allowed to choose the song that played during personal dances.

34.

Pursuant to company practices established by the Defendant, Plaintiffs and other dancers/entertainers spent time in private rooms with customers. The price paid by Plaintiffs for time in a private room was set by Defendant's authorized agents and was the same regardless of which entertainer was spending time in the private room with a customer(s) or by herself.

35.

Defendant's authorized agents required KOD dancers to collect and account for monies received directly from KOD customers, and specified a method for the money to be collected and

counted by other KOD employees.

36.

Defendant's authorized agents controlled the number of days KOD dancers worked and the times they worked by:

a. requiring them to work a minimum number of shifts per week (four), including two "slow" days";

b. charging them larger amounts as "house fees" if they worked fewer than the minimum number of shifts per week; and

c. and charging them an escalating scale of "house fees" depending on the time they arrived at work, i.e, the later the arrival, the more the "house fee."

37.

Defendant, through her appointed agents supervised, regulated, and controlled entertainers' attire and appearance, including prohibiting certain attire/accessories, or insisting that specified attire be worn, and reserving the right to determine the acceptability of dancers' appearance before beginning work.

38.

Based on negotiations conducted by Defendant Galardi herself, KOD was sold in July, 2014, for more than six million dollars ($6,000,000). Prior to that time Plaintiffs were routinely required by Defendant's authorized agents to attend meetings at Defendant's business (KOD), for which they receive no compensation whatsoever, on pain of being suspended or otherwise severely disciplined or terminated.

39.

Defendant Galardi financed and made all decisions governing all advertising, marketing, and promotional efforts undertaken on behalf of the club, as well as: club location, club hours of operation; club theme-motif, food and beverage selection and inventory, cover charges, house fees paid to the club and handled all legal disputes that were club related.

40.

Defendant Galardi, through her agents, controlled virtually every aspect of the Club's operations which were determinative as to the amounts of monies dancers could earn while working at KOD.

41.

Defendant Galardi made substantial capital and other investments in KOD's facilities, maintenance, sound system, lights, in addition to payroll, taxes, licenses, insurance, rent and food and beverage and inventory. Plaintiffs did not contribute money towards maintaining Defendant's club premises or otherwise provide facilities at the club.

42.

Despite the fact that Plaintiffs were "employees", they were nonetheless required by Defendant to pay for Club mandated costumes, shoes, accessories, make-up, hair styling, manicures and pedicures.

43.

Plaintiff's required investments in the costumes, shoes, accessories, make-up, hair styling, manicures, and pedicures, was substantially dwarfed by Defendant's relative investments in the KOD operations.

44.

Defendant's authorized agents made all hiring decisions regarding waitstaff, security, entertainer, managerial and all other employees at all Galardi owned night clubs including KOD.

45.

KOD dancers were not permitted to work at non-Galardi-controlled strip clubs; if management learned that a dancer was working at another strip club, the dancer would be severely disciplined in the form of monetary fines, and/or suspensions.

46.

The only source of monies received by Plaintiffs relative to their employment with Defendant came in the form of gratuities received directly from KOD customers, a portion of which they were required to pay to Defendant Galardi every night in cash.

47.

Plaintiffs and all other KOD dancers/entertainers were economically dependent on tips paid by customers, making their opportunity for profit or loss a function of how many customers frequented the club (based on Management's marketing, advertising, and promotional decisions); how much money customers had, how much they were willing to spend, and how much Defendant required entertainers to pay in order to work at KOD.

48.

Plaintiffs' opportunity for profit and loss at KOD did not depend on their management skills, as their jobs did not call for or require any management skills.

49.

The services performed by Plaintiffs and all other dancers-entertainers were integral to the success of KOD.

50.

Rather than paying wages to Plaintiffs, Defendant instead required KOD Plaintiffs and all other dancers/entertainers to pay *her* for the privilege of working at KOD, with such payments taking the form of:

a. "house fees" payable upon entering the club in amounts set solely by the Defendant;

b. a surcharge in an amount set by them (10% tax on their gross daily earnings, which was payable during and after their shifts in cash);

c. mandatory tip-outs to other Club personnel, including but not limited to the DJ, the House Mom, and to security personnel; and

d. routinely being fined for work rule infractions.

51.

Defendant Galardi failed to create and maintain records reflecting the dates, times, and hours worked by KOD dancers/entertainers.

52.

At no time did the Defendant ever include monies received by Dancers from KOD customers in the recorded gross revenues of Fly Low, Inc. dba KOD.

53.

Defendant Galardi toured the Club to assess conditions after her Father's death, and personally decided to remodel the Club, choosing the carpeting, upholstery, and furniture, and ultimately expending $300,000 of her own funds in connection with the remodeling.

54.

Before and after the death of Jack Galardi, Teri Galardi maintained an office and conducted business at the King of Diamonds facility.

55.

After her Father's death, Defendant Galardi was universally considered by the General Managers of all Galardi-controlled Clubs to be their "boss".

56.

Defendant Galardi personally supervised and directed KOD Office Manager Jennifer Saunders

57.

Defendant Galardi gave directions and instructions to Fly Low employees Bob Hilton and Steve Ennis.

58.

Defendant Galardi personally supervised KOD office employee Mary Albenaz.

59.

Defendant Galardi monitored important club events and promotions.

60.

Defendant Galardi made the decision to wholesale change of KOD management personnel.

61.

In the years 2013-14, Defendant Galardi selected Akinyele Adams to become KOD's General Manager and authorized agent to act in her place.

62.

Defendant Galardi personally ordered the firing of KOD General Manager Liz Cedeno in 2013, as well as other KOD managers months after she installed Akinyele Adams as KOD's general manager and agent. Mr. Adams was given full authority by Defendant Galardi to represent her interests in the club.

63.

Defendant Galardi was Fly Low VP Steve Ennis's boss—she supervised and directed him.

64.

Defendant Galardi–with knowledge of the illegality of the "independent contractor business model" chose to continue that policy during the last years of Jack Galardi's life and after his death.

17

65.

Defendant Galardi continued the policy of mandatory house fees/tip outs after her father's death.

66.

During the last years of Jack Galardi's life, only he or Defendant Teri Galardi possessed the authority to change the "independent contractor" business model applicable at all Galardi South Enterprise Consulting Inc.'s "affiliated clubs", including the King of Diamonds.

67.

Defendant Galardi, with the aid of her attorneys and subordinates, implemented, as a condition of continued employment, a mandatory arbitration policy for KOD dancers in April of 2014.

68.

After a KOD dancer was fired for refusing to sign the arbitration policy in April of 2014, and after being threatened with legal action as a result, Defendant Galardi (not Akinyele Adams) ordered that the Dancer be permitted to return to work.

69.

Defendant Galardi signed Fly Low, Inc. checks, including paychecks (or authorized others to use her signature stamp to do so), and transferred the KOD payroll function from Atlanta to Miami.

70.

Defendant Galardi made decisions regarding settlement of lawsuits against Fly Low/ KOD.

71.

On April 8, 2014, a group of KOD dancers sued Defendant Galardi and non-party Fly Low, Inc., in the United States District Court for The Southern District of Florida, asserting claims for minimum wage compensation under the FLSA and under Florida Law, in particular, under Article X, Section 24 of the Florida Constitution. *Espinoza et al v. Fly Low, Inc., and Teri Galardi,* Civil Action File No. 1:14-CV-21244-Goodman.

72.

The Florida law and Fair Labor Standards Act claims asserted in *Espinoza* by other KOD dancers against the Defendant in this proceeding shared the legal issues as those presented in this action, that is, whether Galardi:

a. was the "employer" of KOD dancers;

b. willfully misclassified KOD dancers as "independent contractors" when, based on clearly established law, KOD dancers should have been treated and paid as "employees";

c. failed to pay KOD dancers a single penny in wages; and

d. unlawfully forced KOD dancers to pay her "kickbacks" for the privilege of working at KOD.

73.

On January 1, 2016, the Espinoza court certified Plaintiffs' Florida law claims as a Rule 23 class action. On April 10, 2018, however, the Court elected not to exercise Supplemental Jurisdiction over the Florida law claims pursuant to 28 U.S.C. §1367( c), noting that under 28 §1367(d), the state law claims had been tolled during the pendency of the lawsuit.

74.

Thereafter, the *Espinoza* Plaintiffs' minimum wage claims were tried to a jury beginning on June 18, 2018, and concluding on June 26, 2018.

75.

Prior to the jury commencing its deliberations, the trial court instructed it on the applicable law, including a) the "economic realities" test (which governs the determination as to whether a particular individual is an "employee" or is instead an "independent contractor"), as well as the concepts of "willfulness", and personal liability.

76.

On June 26, 2018, the *Espinoza* jury reached a verdict. More specifically, the jury was submitted "Special Interrogatories", which resulted in the following determinations:

a) Both Fly Low and Galardi were the "employers" of KOD dancers;

b) KOD dancers were Fly Low's and Galardi's "employees";

c) Fly Low and Galardi failed to pay KOD dancers the minimum wage required by law; and

d) Fly Low and Galardi acted "willfully" (i.e., "kn[e]w or show[ed] reckless disregard for whether the FLSA prohibited their conduct").

77.

Based on these findings, the jury in Espinoza awarded the KOD dancers minimum wage and overtime damages totaling $818,236, plus an additional $75,000 to one of the named Plaintiffs for retaliatory firing after the filing of the lawsuit.

78.

On September 20, 2018, the *Espinoza* Magistrate Judge Goodman awarded liquidated damages to all Plaintiffs that testified pursuant to the FLSA, and entered final judgment.

79.

Galardi appealed the final judgment to the Eleventh Circuit Court of Appeals. On May 7, 2019, the Appellate Court affirmed the final judgment against Galardi and sanctioned the Defendant and her counsel for filing a frivolous appeal.

80.

On September 24, 2018, Arbitrator Michael Kohler granted a motion for summary judgment on the issue of Teri Galard's status as statutory "employer" of KOD dancers in a proceeding initiated by other KOD dancers during the same time period alleged herein. Those arbitrations were styled Beck et al v Teri Galardi.

81.

On February 26, 2019, Arbitrator Michael Kohler entered final judgment against Defendant Galardi as to the FLSA and Florida law minimum wage claims being pressed by four other former King of Diamonds dancers.

82.

On July 10, 2020, over the objection of Defendant Galardi, this Court confirmed the arbitral awards in the Beck arbitrations.

83.

Plaintiffs are each entitled to apply offensive collateral estoppel because Defendant Galardi has been found to be an employer and personally liable in the *Espinoza* matter (which was affirmed on appeal and appellate counsel sanctioned) and the above referenced *Beck* arbitration matters that were converted into a federal court judgment by this Court.

84.

Plaintiffs have satisfied all conditions precedent to bringing this action, including with respect to Plaintiffs' claim under the Florida Minimum Wage Act, having sent written notice of the legal claims not less than 15 days prior to the initiation of this lawsuit and/or the filing of this pleading, identifying in such notices "the minimum wage to which [they] claim[ed] entitlement, the actual or estimated work dates and hours for which payment is sought, and the total amount of alleged unpaid wages through the date of the notice."

85.

Because of Defendant's violations of Plaintiffs' rights under Article X, Sec.24 of the Florida Constitution and the Florida Minimum Wage Act, Plaintiffs have suffered lost wages, including being forced to pay illegal kickbacks to or on behalf of the Defendant all in an amount to be determined at trial.

## COUNT I

## ARTICLE X, SECTION 24 MINIMUM WAGE CLAIMS

86.

Plaintiffs repeat and reallege each and every allegation contained in paragraphs one through

eighty-five above with the same force and effect as if herein fully set forth herein.

87.

Defendant's failure and refusal to pay the Plaintiffs any wages whatsoever constitute a willful violation of Article X, Section 24 of the Florida Constitution.

88.

Plaintiffs are therefore entitled to recover the applicable minimum hourly rate specified under Florida law for each hour worked during the applicable limitations period, restitution of fees and fines unlawfully exacted from them by the Defendant, repayment of all sums paid for costumes, shoes, accessories, make-up; hair dressing and all other work expenses foisted on Plaintiffs by the Defendant, plus liquidated damages and attorney's fees and costs of litigation.

## COUNT II

### (In that alternative)

### FLORIDA MINIMUM WAGE ACT (FMWA) MINIMUM WAGE CLAIMS

89.

Plaintiffs repeat and reallege each and every allegation contained in paragraphs one through eighty-five above with the same force and effect as if herein fully set forth herein.

90.

Defendant's failure and refusal to pay the minimum wage required under Fla. Stat. 448.110 to the Plaintiffs constitute a willful violation of FMWA, Fl. Stat. §448.110.

91.

Each named Plaintiff has sent pre-suit notice to the Defendant more than 15 days prior to the filing of this civil action.

92.

Plaintiffs have satisfied all conditions precedent to the filing of this claim.

93.

Plaintiffs are therefore entitled to recover the applicable minimum hourly rate specified under Florida law for each hour worked during the applicable limitations period, restitution of fees and fines unlawfully exacted from them by the Defendant, repayment of all sums paid for costumes, shoes, accessories, make-up; hair dressing and all other work expenses foisted on Plaintiffs by the Defendant plus liquidated damages for willful violation and attorney's fees and costs of litigation.

## DEMAND FR JURY TRIAL

94.

Plaintiffs demand a trial by jury on all their claims.

**WHEREFORE,** Plaintiffs respectfully pray that this Court GRANT relief as follows:

a.  as to Count I , Article X, Section 24 of the Florida Constitution, an award to the Plaintiffs for the minimum wage specified under Florida law for all hours worked by the Plaintiffs during the applicable limitations period, as well as restitution of all fees, fines, charges and mandatory tip-out outs paid to the Defendant (or to others on Defendant's behalf) by the Plaintiffs, repayment of all funds Defendant required Plaintiffs to expend for costumes,

24

shoes, accessories, makeup, hair styling, manicures, pedicures and the like. liquidated damages, interest and attorney's fees as provided for under Article X, Section 24 of the Florida Constitution;

b.  as to Count II, FMWA, in the alternative, an award to the Plaintiffs for the minimum wage specified under Florida law for all hours worked by the Plaintiffs during the applicable limitations period, as well as restitution of all fees, fines, charges and mandatory tip-outs paid to the Defendant (or to others on Defendant's behalf) by the Plaintiffs, repayment of all funds Defendant required Plaintiffs to expend for costumes, shoes, accessories, makeup, hair styling, manicures, pedicures and the like. liquidated damages, interest and attorney's fees as provided for under the FMWA;

c.  liquidated damages in amount equal to the amount of damages assessed for willful violations of the Article X or the FMWA;

d.  an award of attorneys and expenses of litigation;

e.  trial by jury as to all issues of fact;

f.  such other and/or further relief as the Court may deem just and necessary.

Respectfully submitted this 16th day of March, 2021.

s/ Carlos V. Leach
Carlos V. Leach, Esquire
FBN: 0540021
Edward W. Wimp, Esquire
FBN: 1015586
THE LEACH FIRM, P.A.
631 S. Orlando Ave., Suite 300
Winter Park, FL 32789
Telephone: (407) 574-4999
Facsimile: (833) 813-7513
Email: cleach@theleachfirm.com
Email: ewimp@theleachfirm.com
